COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DAVID J. QUICK, | § | No. 08-06-00153-CV |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 380th District Court |
| PLASTIC SOLUTIONS OF TEXAS, | § | of Collin County, Texas |
| INC., A TEXAS CORPORATION; PLASTIC SOLUTIONS MOLDING, | § | |
| INC., A TEXAS CORPORATION; KURT H. RUPPMAN, SR., INDIVIDUALLY, | § | (TC#380-2143-04) |
| and FAIRFIELD ENTERPRISES, INC. | § | |
| Appellees. | § | |
| | § | |
| | § | |

**O P I N I O N**

Appellant, David J. Quick, appeals a take-nothing judgment on various contract claims he brought against Appellees, Plastic Solutions of Texas, Inc. ("PST"), Plastic Solutions Molding, Inc. ("PSMI"), Kurt H. Ruppman, Sr. (collectively, the "PST Defendants"), and Fairfield Enterprises, Inc. ("Fairfield"). We affirm the judgment of the trial court.

**I. BACKGROUND**

Quick is a certified public accountant. In 1994, he started his own accounting practice. Shortly thereafter, Quick met Appellee Kurt Ruppman, Sr. who, at the time, was serving as president of Piper Plastics. Ruppman left Piper Plastics in late 1994 and started PST. Ruppman began experimenting with the use of very cold temperatures in the manufacture of hot-fill PET (Polyethylene Terephthalate) plastic bottles. He developed a process by which preform plastic bottles were heated, stretched with a stretch rod, injected with liquid nitrogen at high pressure, and

molded. Ruppman referred to the process as "cryogenic," because of the cold temperatures involved, due to the presence of liquid nitrogen. Ruppman applied for and received a patent for his process.

During this time, Quick did some work for Ruppman by preparing projections and forecasts for potential business pursuits. Ruppman informed Quick that he was not able to pay him for such services, but suggested that he might work for an interest in the company. Quick was impressed with Ruppman's knack for ideas and saw a potential financial gain in working for an interest in his business. In February or March of 1995, Quick and Ruppman discussed an agreement, which Quick had prepared, that would grant him a royalty interest in PST. The two discussed various terms, but never executed the agreement. Nevertheless, Quick believed that he had an oral agreement for 5 percent of the gross margin of Ruppman's business. In return, according to Quick, he was to provide various services to PST.

Beginning in late 1995, Ruppman entered into a series of agreements with the Ball Corporation ("Ball"), in which Ball acquired exclusive licensing rights to Ruppman's patented process. Under the agreements (collectively, the "Ball Agreements"), Ball paid a total of $1.5 million to PST during 1995 and 1996. PST was obligated to use its best efforts to develop a commercially viable process for manufacturing bottles using the cryogenic technology. If PST could do so, Ball was obligated to commit to firm orders for production machinery or market sub-licenses of the patented technology. Ball and PST were to split any sub-licensing revenue. During the following months, Ruppman attempted to develop such a commercially viable process to manufacture PET bottles, using the cryogenic technology.

Ball is well-known in the container industry. Due to its participation with Ball, many people in the plastics industry were interested in PST's cryogenic technology. PST had very high expectations for the relationship with Ball and believed that Ball, which had become the exclusive

sub-licensor of the technology, would be successful in licensing it. Ball, in turn, appeared to believe that the licensing would be successful, and it represented to PST that it was a good technology.

Sometime in late 1996 or early 1997, Quick assisted Ruppman in locating two eventual investors in PST--J. Lewis Partners ("Lewis Partners") and ELK Trust. The deal which the parties discussed was a loan to PST in exchange for a royalty interest. Quick prepared a proposed royalty agreement for Lewis Partners, ELK Trust, and himself based on a contract that Ruppman had previously used and given to him. Lewis Partners and ELK Trust ultimately loaned a total of $650,000 to PST, and PST granted each a royalty interest in revenues generated by income from licensed patents, products, and technical information. Quick and Ruppman and PST entered into an agreement, entitled "Royalty Revenue Agreement" (the "Agreement"), on January 23, 1997.

The Agreement defines the participants as Quick on the one hand and Ruppman and PST on the other, and it is signed by Quick and by Ruppman, as president of PST. The Agreement grants Quick a 3 percent interest in Net Royalty Income Revenue, which is calculated by deducting legal fees and costs incurred in enforcing PST's patent rights or defending PST against claims for infringement. Paragraph 1.7 of the Agreement defines "Royalty Income Revenue" as:

> [I]ncome derived from Licensed Products which are covered by one or more claims of an issued and existing Licensed Patent or which are manufactured by any licensee through use of a Licensed Process covered by one or more claims of an issued and existing Licensed Patent paid to PST's Royalty account.

In the spring of 1997, Ruppman attended a conference known as "Bev Pak." The major plastics companies and numerous companies from around the world attended. PST, Ball, and others gave a presentation regarding the cryogenic technology. Following Ruppman's portion of the presentation, Ball representatives announced that they could not talk about the technology and would not license it, because it was too premature. The Ball announcement had a significantly negative

impact on PST's business. PST's plans for significant licensing revenue from Ball vanished, and the relationship between PST and Ball deteriorated. The two companies disputed whether the technology was commercially viable. Ultimately, an arbitrator concluded that the technology had not been commercially viable. PST settled the dispute by repurchasing the licensing rights granted to Ball.

By May of 1997, PST was cash broke and needed additional investment. At the time, PSMI, a wholly-owned subsidiary of PST, which was started by Ruppman as a small manufacturing operation, was manufacturing flower pot carrying trays, high density bottles for fertilizer, and PET water bottles. This brought in approximately $40,000 to $50,000 a month.

At Ruppman's request, Quick approached Lewis Partners to solicit additional investment, but they refused. Thereafter, Quick approached his parents, the Quicks,[1] and his aunt and uncle, the Bollners, about investing. In exchange for a royalty interest in certain revenue streams of the PST Defendants, the Quicks and the Bollners agreed to a loan totaling $100,000. Unlike Quick's royalty agreement, the Bollners' and Quicks' agreements defined the royalty interest to include net manufacturing of PSMI.[2]

Around the time the Bollners and the Quicks entered into their agreements, PSMI's manufacturing revenue dropped, due to the fact that PSMI's handful of customers were experiencing problems of their own. By the fall of 1997, PST and PSMI were in dire financial condition. PST was no longer able to make the payments required under the Quicks' and Bollners' notes. This put

---

[1] Hereinafter, "Quick," in the singular, shall refer to Appellant, David Quick; "the Quicks," in the plural, shall refer to his parents, George and Norma Quick.

[2] The Bollners and the Quicks brought similar claims against Appellees in a lawsuit styled *Daniel J. Bollner et ux. Dorothy L. Bollner; George J. Quick et ux. Norma A. Quick v. Plastics Solutions of Texas, Inc., a Texas Corporation; Plastics Solutions Molding, Inc., a Texas Corporation; and Kurt H. Ruppmann, Sr., Individually and Fairfield Enterprises, Inc.*, Cause No. 380-1399-04, in the 380th District Court of Collin County, Texas, which is the subject of a companion appeal. The Bollners' and Quicks' claims and those of Quick were tried together.

a strain on the relationship between Ruppman and Quick.

In October 1997, PST received $200,000 from a nitrogen supply company known as "BOC." BOC was willing to provide money to help PST stay afloat, in the hopes that PST could commercially develop the cryogenic technology, which used liquid nitrogen. BOC ultimately agreed to provide PST with $1.5 million for a potential marketing agreement and a share in revenue. However, this infusion of cash was made on the condition that the money be repaid as a loan at BOC's election. BOC tried unsuccessfully to license PST's cryogenic technology and eventually opted to cancel the agreement and sought repayment from PST. PST and Ruppman were ultimately unsuccessful in convincing the bottling industry to use the technology.

By April 1998, PST was again in desperate financial condition and was about to shut down. Ruppman met John Albers, a potential investor. After reviewing PST's and PSMI's financials, Albers, through Appellee Fairfield, began to invest in the companies, keeping them alive. Ultimately, Albers, through Fairfield, invested over $20 million in PST and PSMI. The PST Defendants continued to try to license the cryogenic technology, but without success. Their focus changed from licensing to manufacturing.

Around May of 1998, Quick stopped providing any services for the PST Defendants. In November of 2002, Quick visited Ruppman at the PST/PSMI facility. Quick believed that the company had expanded and appeared to be doing well. He and his uncle, Daniel Bollner, became suspicious that the PST Defendants had not been honest with them regarding potential royalty income. Bollner sent Ruppman a letter inquiring about his interest. Ruppman responded that none of the royalty provisions had been triggered and that there were no current plans to use the cryogenic technology.

Thereafter, Quick filed this lawsuit, asserting claims against PST Defendants in tort,

contract, and for a declaratory judgment as to the Agreement. The PST Defendants counterclaimed for usury and sought a declaratory judgment that no sums were owed to Quick. Quick subsequently brought claims against Fairfield, based on a vicarious liability theory. Fairfield brought a no-evidence motion for summary judgment on all of Quick's claims against it, which the trial court granted. The PST Defendants moved for partial summary judgment, based, among other things, on the defense of limitations. The trial court granted the motion as to all contract claims prior to June 1, 2000. Quick has not appealed that order.

Following a bench trial, the trial court entered a take-nothing judgment against Quick. The court concluded that the "unambiguous and proper construction of the term 'Net Royalty Income Revenue' is limited to licensing income PST received on or after January 23, 1997," which is the date of the Agreement. The court also concluded that the scope of the technology defined in the Agreement was ambiguous. The court found that the intention of the parties in that respect was that PST was only obligated to pay a royalty for licensing income received on or after January 23, 1997, "from the heat-set/barrier blow molding technology process PST was trying to market in January of 1997, which used nitrogen at the blow molding stage in bottle manufacturing, and that process alone." The court found that PST had received no such income since the date of the Agreement. The court also concluded that Quick's claim for breach of contract was barred by failure of consideration and prior material breach. Finally, the trial court awarded Fairfield attorney's fees, pursuant to the Uniform Declaratory Judgments Act.

On appeal, Quick challenges the trial court's construction of the Agreement, the court's findings and conclusions as to failure of consideration and prior material breach, and the court's award of attorney's fees to Fairfield. The claims that are relevant to this appeal are Quick's claims for declaratory judgment, for an accounting of the income derived from the PST Defendants'

products, and breach of contract.

## II. DISCUSSION

### A. Standard of Review

Legal and factual sufficiency of the evidence standards of review govern an appeal of a non-jury trial on the merits. *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 445 (Tex. 1997). When a party appeals from a non-jury trial, it must complain of specific findings and conclusions of the trial court. *Carrasco v. Stewart*, 224 S.W.3d 363, 367 (Tex. App.--El Paso 2006, no pet.); *see also Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 580 (Tex. App.--El Paso 2004, pet. denied). A general complaint against the trial court's judgment does not present a justiciable question. *Carrasco*, 224 S.W.3d at 367; *Serrano*, 162 S.W.3d at 580.

A "no-evidence," or legal-insufficiency, point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *Serrano*, 162 S.W.3d at 579. There are two separate "no-evidence" claims. *Id.* When the party with the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." *Id.* When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id.* (citing *In re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex. App.--El Paso 1999, no pet.)). An appellate court will sustain a legal-sufficiency, or "no-evidence," challenge, if the record shows: (1) the complete absence of a vital fact, (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) that the evidence offered to prove a vital fact is no more than a scintilla, or (4) that the evidence establishes conclusively the opposite of the vital fact. *Carrasco*, 224 S.W.3d at 367 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)).

We review a trial court's conclusions of law *de novo*. *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 322 (Tex. App.--El Paso 1995, writ denied). Erroneous conclusions of law are not binding on the appellate court, but, if the controlling findings of fact will support a correct legal theory, are supported by the evidence, and are sufficient to support the judgment, then the adoption of erroneous legal conclusions will not mandate reversal. *Heritage Resources, Inc. v. Hill*, 104 S.W.3d 612, 621 (Tex. App.--El Paso 2003, no pet.).

Findings of fact made by the trial judge, sitting as the fact finder, enjoy the same status as findings of a jury. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Heritage Resources*, 104 S.W.3d at 619. Where the party with the burden of proof is challenging the factual sufficiency of the findings, the appropriate complaint is that the adverse findings are "against the great weight and preponderance of the evidence." *Tate v. Tate*, 55 S.W.3d 1, 5 (Tex. App.--El Paso 2000, no pet.). In reviewing a factual sufficiency point, we must consider all of the evidence and determine whether the adverse finding was so against the great weight and preponderance of the evidence that it was clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We do not pass upon the witnesses' credibility, nor do we substitute our judgment for that of the fact finder, even if the evidence would clearly support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.), *cert. denied*, 525 U.S. 1017 (1998).

## B. Conclusion of Law Three

Quick first challenges Conclusion of Law Three, in which the trial court held that the unambiguous and proper construction of the term "Net Royalty Income Revenue" is limited to licensing income which PST received on or after January 23, 1997.[3] Quick argues that the trial court

---

[3] In Finding of Fact Three, the trial court found that "PST received no licensing income on or after January 23, 1997 from any source or in relation to any technology." Quick does not challenge this finding.

erred in its construction of the Agreement for two reasons. First, the court improperly limited the Agreement to licensing income received by PST, because the Agreement also provides a royalty for manufacturing income. Second, Quick contends that the trial court ignored the existence of a licensing agreement that Ruppman had with PST and PSMI.

### 1. Contractual Interpretation

With regard to PSMI's manufacturing income, Quick points to the language of paragraph 1.7 of the Agreement, quoted above. Quick argues that the phrase "manufactured by any licensee through use of a Licensed Process" entitles him to a royalty on PSMI's manufacturing income. Quick later argues that PSMI is a "licensee," because the term "license" in the Agreement merely means "to use," and that PSMI has been using a licensed process in manufacturing its products. Thus, Quick contends, the Agreement not only provides an interest in licensing fees paid to PST, but also any income to PST derived from the manufacture of licensed products by PSMI. Quick does not explain how PSMI's manufacturing income is the same as income to PST, but merely argues that "[i]ncome was received by PST through PSMI after January 23, 1997."

To construe a contract, the court should ascertain the objective intent of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To do this, courts should examine and consider the entire instrument in an effort to harmonize and give effect to all provisions, so that none will be rendered meaningless. *Id.* No single contract provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.* The language in a contract should be given its plain grammatical meaning, unless to do so would defeat the parties' intent. *DeWitt County Elec. Coop. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).

Ambiguity is a question of law that must be decided by examining the contract as a whole,

in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). A contract is not ambiguous, if it can be given a definite or certain meaning as a matter of law. *Id.* However, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent. *Id.* An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Id.* For an ambiguity to exist, both interpretations must be reasonable. *Id.*

The "Payments and Accounting" section of the Agreement indicates that it only applies to licensing income. The Agreement requires royalty payments to be made from an escrow account on a monthly basis. In the same section, the Agreement provides that "At such time, escrow agent shall include with such payment a statement of accounting setting forth the amount of Net Royalty Income Revenue earned and collected from each *licensee* during the preceding calendar month" (emphasis added). The accounting and payment section also provides that "PST warrants it is the owner of the Licensed Technical Information and the Licensed Patents and that the [sic] PST has the right to grant *licenses*" and that "PST and Ruppman shall have no liability for any loss, expense of [sic] damage, arising from any uncollected royalties from any *licensee* . . . ." (both emphases added). There are no provisions regarding the payment of a royalty on any other type of income.

The Agreement's recitals[4] are also revealing:

WHEREAS, PST filed an application for patent in the United States and other foreign countries which it intends will cover the heat-set/barrier blow molding technology and preforms and bottles manufactured using such technology; and is

---

[4] Although recitals to a contract generally will not control a contract's operative clauses, unless those clauses are ambiguous, the recitals may be looked to in determining the proper construction of the contract and the parties' intent. *Gardner v. Smith*, 168 S.W.2d 278, 280 (Tex. Civ. App.--Beaumont 1942, no writ); *see also BCH Dev. Corp. v. Bee Creek Hills Neighborhood Ass'n*, 1996 WL 727385 (Tex. App.--Austin Dec. 19, 1996, writ denied) (not designated for publication) (stating that a recital may, in some circumstances, be looked to in determining the proper construction of a contract and the parties' intent).

licensing said technology worldwide, and any other applications of this technology; and

WHEREAS, Participant [Quick] has been of assistance to further PST's licensing efforts and;

WHEREAS, PST is willing to grant to Participant and Participant desires to obtain an interest in PST's royalty income from licensing PST's and [sic] technical and commercial information relating to their heat-set/barrier blow molding technology, and any other applications of this technology.

Finally, although the terms "Licensed Patents," "Licensed Technical Information," "Licensed Products," and "Licensed Process" are defined terms in the Agreement, the use of the adjective "licensed" in each definition further indicates that the Agreement concerns licensing income. When considered as a whole, it is apparent that the Agreement provides Quick a royalty interest in licensing income to be received by PST.

The circumstances surrounding the execution of the Agreement also support the trial court's conclusion. At the time that Quick entered into the Agreement, there were very high expectations regarding the potential for PST's relationship with Ball to generate significant income from licensing. Indeed, this is why people were willing to invest in PST. The basis for the Ball Agreements was the licensing of Ruppman's cryogenic technology. Under the terms of the Ball Agreements, PST and Ball would split income received from licensing the technology. The interest in licensing income was substantial enough for the ELK Trust and Lewis Partners to invest a total of $650,000 in PST, in exchange for royalty agreements. Moreover, PSMI had only recently been formed by Ruppman to manufacture flower trays and water bottles. PSMI did not have the capability to do substantial manufacturing at the time and was not doing so. Accordingly, we believe that the

trial court's construction of the contract was correct.[5]

## 2. Exclusion of Evidence

Quick also argues that the trial court committed harmful error by refusing to admit into evidence a superseded pleading of the PST Defendants, in which they admitted that manufacturing income was subject to the Agreement. At trial, Quick's attorney asked Ruppman whether his contention was that the Agreement allowed Quick a royalty only if the income came from licensing of the cryogenic technology. Ruppman responded that this was correct. Counsel for Quick then questioned Ruppman about the PST Defendants' Original Answer and Counterclaim, which had been superceded. Counsel for Quick asked Ruppman whether, in their Original Answer and Counterclaim, the PST Defendants had requested a declaratory judgment, that the court "declare and define that the cryogenic royalty agreement has no application to any revenue other than as derived from licensing or manufacture of products using cryogenic technology processes . . . ." Ruppman confirmed that this was what the superceded pleading stated. The trial court overruled the PST Defendants' objection to this questioning, but refused to admit the pleading into evidence.

A trial court's decision on the admissibility of evidence is reviewed under an abuse of discretion standard. *Franco v. Franco*, 81 S.W.3d 319, 340 (Tex. App.--El Paso 2002, no pet.). To successfully challenge a judgment based on the exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause the rendition of an improper judgment. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Sears, Roebuck*

---

[5] Although Quick's argument is not entirely clear, to the extent that he contends that PSMI was a licensee of PST and that PST received licensing income from PSMI, this argument fails. The trial court found that PST received no licensing income from the date of the Agreement "from any source or in relation to any technology . . . ." Quick does not challenge the sufficiency of this finding on appeal. As such, we do not address Quick's apparent argument that PST received licensing income from PSMI.

*& Co. v. Abell*, 157 S.W.3d 886, 897 (Tex. App.--El Paso 2005, pet. denied). The complaining party is not required to prove that "but for" the error, a different judgment would necessarily have resulted. *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992). However, the complaining party must show that the error "probably" resulted in an improper judgment. *Alvarado*, 897 S.W.2d at 753; *Abell*, 157 S.W.3d at 897. Reversible error usually requires showing that the judgment turns on the particular evidence excluded or admitted. *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *Alvarado*, 897 S.W.2d at 753-54; *Abell*, 157 S.W.3d at 897. We must review the entire record in making this determination. *Abell*, 157 S.W.3d at 897.

Subject to the rules of evidence, an abandoned pleading is admissible into evidence against the pleader. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007); *Huff v. Harrell*, 941 S.W.2d 230, 239 (Tex. App.--Corpus Christi 1996, writ denied). If a superseded pleading is that of a party-opponent and is offered against that party, it is not hearsay. *Id.*; TEX. R. EVID. 801(e)(2). It is not necessary that the superceded pleading be inconsistent with the party's position at trial in order to be admissible. *Id.*

When Quick's counsel offered the pleading into evidence, the PST Defendants objected on the basis that a superceded pleading is not admissible for any purpose. The PST Defendants did not object on any other basis. The trial court sustained this objection and refused to admit the pleading. In doing so, the trial court erred. However, the exclusion of this evidence does not constitute reversible error. Statements contained in superseded pleadings are not conclusive and indisputable judicial admissions. *Sosa v. Central Power & Light*, 909 S.W.2d 893, 895 (Tex. 1995). When a pleading is superseded, it is no longer binding on the pleader, in the sense that he is prevented from disputing the facts contained within it. *Tyra v. Bob Carroll Constr. Co.*, 618 S.W.2d 853, 856 (Tex. Civ. App.--El Paso 1981), *aff'd*, 639 S.W.2d 690 (Tex. 1982). The pleading at issue was therefore

not conclusive, and the PST Defendants were entitled to dispute it. Moreover, counsel for Quick was permitted to read the relevant portion of the pleading on the record and impeach Ruppman on it.[6]

### 3. The Ruppman License

Quick also argues that the trial court erred by ignoring evidence regarding income from a licensing agreement among Ruppman, PST, and PSMI, entered into on April 5, 1995, and again on May 1, 1996, that obligated PST to pay Ruppman and his family $50,000 per month for use of the cryogenic technology (the "Ruppman License"). Quick argues for the first time on appeal that he is entitled to a 3 percent royalty, in the amount of $102,000, relating to the Ruppman License. Quick argues that this amount is equivalent to a 3 percent royalty on all contemplated payments under the Ruppman License from the limitations bar of June 1, 2000, through February 9, 2006, the date of judgment. Although the license was mentioned at trial, the issue was not presented in Quick's damage calculations, no damage amount was presented to the trial court, and no findings of fact or conclusions of law were filed concerning it. Accordingly, Quick waived this claim. TEX. R. APP. P. 33.1(a). Moreover, even if the claim had been presented, the evidence at trial showed that, on July 1, 1999,[7] Ruppman assigned all of his right, title, and interest in the patents and confidential information concerning the cryogenic technology to PST. This was a requirement of Albers as part of his investment in PST. After that time, no royalties were paid to Ruppman.

Quick argues for the first time in his reply brief that he is entitled to a royalty on the $1.5 million paid to PST by BOC. Although the PST Defendants argued in their response that Quick was not entitled to a royalty based on the marketing fee, Quick's argument here is not properly before this

---

[6] The trial judge was thus aware of the prior pleading and Appellant's contention regarding it at the time he prepared his findings of fact and conclusions of law. Therefore, even though we have held that the judge erred in refusing to receive the Original Answer into evidence, we nevertheless conclude that it is "improbable" that his failure to do so resulted in an improper judgment.

[7] This transfer occurred outside the statute of limitations period.

Court.  The rules of appellate procedure do not permit an appellant to add a new issue in a reply brief in response to some matter pointed out in the appellee's brief, but not raised in the appellant's original brief.  *Howell v. Texas Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex. App.--Austin 2004, pet. denied); *see also Armstrong v. Roberts*, 211 S.W.3d 867, 873 n.4 (Tex. App.--El Paso 2006, pet. denied) (an issue raised in a reply brief is not properly preserved for appellate review).  "A party waives its challenges to the findings of fact and conclusions of law if it fails to raise them in its original appellate brief."  *Howell*, 143 S.W.3d at 439.  Accordingly, we do not consider this argument.[8]

### C.  Conclusions of Law Five and Six

Quick next challenges Conclusions of Law Five and Six, arguing that they are unsupported by either legally or factually sufficient evidence.  In Conclusion Five, the court held that the term "Net Royalty Income Revenue" was limited to income PST received on or after January 23, 1997, from the licensing of defined technology, the exact scope of which was ambiguously stated in the Agreement.  In Conclusion Six, the court held that "the intention of the parties to the Contract controls and that intention limit[ed] the scope of the term to licensing income PST received on or after January 23, 1997 from the heat-set/barrier blow molding technology process . . . ."  Quick argues that the court improperly limited the term "Net Royalty Income Revenue" to income only "from the licensing of defined technology," because that phrase does not appear in the Agreement.  Quick further argues that the definitions in the Agreement unambiguously define the technologies that are covered by the Agreement.  However, Quick does not explain which technologies are

---

[8]  Quick also challenges Conclusion of Law Four, in which the trial court concluded "[s]hould the contract be determined by an appellate court to be ambiguous in regard to whether the Contract term 'Net Royalty Income Revenue' includes anything other than licensing income PST received on or after January 23 ,1997, then the intention of the parties to the Contract controls and that intention limits the scope of that term to licensing income PST received on or after January 23, 1997."  Because we have overruled Quick's issue concerning Conclusion of Law Three, we do not address his argument concerning Conclusion of Law Four.

unambiguously covered.

Quick does not challenge Finding of Fact Four, in which the trial court found that "[t]he intention of the parties to the Contract was for PST to only be obligated to pay Plaintiff a royalty under the terms of the Contract if PST received licensing income on or after January 23, 1997 from the heat-set/barrier blow molding technology process PST was trying to market in January of 1997, which used nitrogen at the blow molding stage in bottle manufacturing, and that process alone."

A trial court's conclusions of law are reviewed as a legal question, and an appellant may not challenge a conclusion of law for factual insufficiency. *I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 883 (Tex. App.--El Paso 2005, pet. denied). A reviewing court "may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.* However, if an appellant does not challenge the trial court's findings of fact on appeal, the findings normally become binding upon both the party and the appellate court. *Carrasco*, 224 S.W.3d at 367; *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986) (unchallenged findings of fact are "binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding"). Finding of Fact Four clearly supports the challenged conclusions. The trial court thus did not err in reaching the challenged conclusions.

### D. Conclusion of Law Seven

Quick contends that the trial court's conclusion that the PST Defendants did not breach any term of any contract with him is "wrong." Conclusion Seven states that "[t]he PST Defendants did not breach any term of the contract with Plaintiff, and the PST Defendants are entitled to a take nothing judgment as to Plaintiff's claim for breach of contract." The thrust of Quick's argument is that the trial court misinterpreted the term "cryogenic" as it is used in the Agreement. Quick contends that Ruppman improperly testified as an expert, that his opinion as to what "cryogenic"

means could not be relied upon, and that both his testimony and the terms of the Agreement show that "cryogenic" merely means "nitrogen." Quick argues that he was entitled to a royalty on PSMI's gross manufacturing income, because Ruppman applied for a patent for the use of nitrogen in the drying process, and the Agreement covers patent applications relating to the use of nitrogen in the manufacture of plastics. According to Quick, the PST Defendants breached the contract by not paying him such a royalty.

Quick's argument is based on the assumption that the trial court, as the trier of fact, misinterpreted the extent of the royalty interest contained in the Agreement and that PST had received income for which it had not paid Quick. Yet Quick does not challenge the trial court's findings regarding these questions. The trial court found that "[t]he intention of the parties to the Contract was for PST to only be obligated to pay Plaintiff a royalty under the terms of the Contract if PST received licensing income on or after January 23, 1997 from the heat-set/barrier blow molding technology process PST was trying to market in January of 1997, which used nitrogen at the blow molding stage in bottle manufacturing, and that process alone." The trial court also found that "PST received no licensing income on or after January 23, 1997 from any source or in relation to any technology . . . ." As noted above, if an appellant does not challenge the trial court's findings of fact on appeal, the findings become binding upon both the party and the appellate court. *McGalliard*, 722 S.W.2d at 696. The unchallenged findings of fact provide a basis for the trial court's conclusion that the PST Defendants did not breach any agreement with Quick. We overrule this issue.

### E. Reformation of the Contract

Quick argues that the trial court, without the requisite pleadings, impermissibly reformed the Agreement to limit his royalty interest, by concluding that the Agreement was limited to a royalty on licensing income and not manufacturing income and by concluding that the parties intended the

scope of the technology covered by the Agreement to be limited to the heat-set/barrier blow molding process.

"The underlying objective of reformation is to correct a mutual mistake made in *preparing* a written instrument, so that the instrument truly reflects the *original* agreement of the parties." *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987) (emphases in original) (citing *Brinker v. Wobaco Trust Ltd.*, 610 S.W.2d 160, 163 (Tex. Civ. App.--Texarkana 1980, writ ref'd n.r.e.)). "[R]eformation requires two elements: (1) an original agreement and (2) a mutual mistake, made *after* the original agreement, in reducing the original agreement to writing." *Id.* (emphasis in original) (citing *Sun Oil Co. v. Bennett*, 125 Tex. 540, 547, 84 S.W.2d 447, 451 (1935); RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. a (1979)).

No party contends that there was a mutual mistake in drafting any of the Agreements, and the trial court did not, and did not purport to, reform them.

### D.  Uniform Declaratory Judgments Act

Both Quick and the PST Defendants sought declarations as to their rights under the Agreement. "[T]he Uniform Declaratory Judgment[s] Act operates to provide an individual whose rights and legal relations are at issue in a contractual dispute a vehicle by which he can solicit the court to resolve questions of construction or validity under the contract." *Foust v. Ranger Ins. Co.*, 975 S.W.2d 329, 331 (Tex. App.--San Antonio 1998, pet. denied).  A declaratory judgment requires a justiciable controversy as to the rights or status of the parties, and the declaration must actually resolve the controversy. *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163-64 (Tex. 2004). "In suits for declaratory relief, a trial court has limited discretion to refuse a declaratory judgment, and may do so only where judgment would not remove the uncertainty giving rise to the proceedings." *SpawGlass Constr. Corp. v. City of Houston*, 974 S.W.2d 876, 878 (Tex. App.--Houston [14th Dist.]

1998, pet. denied).

The central dispute in this case was whether any royalties were owed under the terms of the Agreement. Quick requested a declaration as to his right to receive royalty payments and specifically requested declarations "that Plaintiff is entitled to be paid his proportionate share of Net Royalty Income Revenue, as that term is defined in the Agreements, i.e., 'income derived from Licensed Products . . . or which are manufactured by any licensee . . .'" and that "the royalty payments apply to income derived from products using Present and Future Technical Information."

The trial court held that Quick and the PST Defendants "sought and were entitled to relief pursuant to the Uniform Declaratory Judgment[s] Act, Tex. Civ. Prac. & Remedies Code, § 37.001, et[] seq. in order to resolve an actual and real controversy and to settle and afford relief from uncertainty and insecurity regarding the proper construction of the Contract." Quick requested a declaration that he was entitled to a royalty on both manufacturing and licensing income, but the trial court held that the Agreement was limited to licensing income. The trial court did not reform the Agreement, but merely interpreted and construed it according to its terms as requested. With regard to the scope of the technology, the trial court, as the fact finder, determined the parties' intent as to an ambiguous term in the Agreement. This does not constitute reformation. We overrule this issue.

### F. Failure of Consideration and Prior Material Breach

The PST Defendants plead failure of consideration and prior material breach as affirmative defenses to Quick's breach of contract claim.[9] The trial court found that the consideration provided by Quick for the Agreement failed, based upon Quick's prior material breach of the Agreement. It therefore agreed that Quick's breach of contract claim was barred because of failure of consideration

---

[9] Although the evidence arguably raises the further question of whether the Agreement was unenforceable for lack of consideration, the PST Defendants did not challenge the Agreement on this ground.

and prior material breach. Quick argues that the finding and the conclusion are based on legally and factually insufficient evidence. Specifically, Quick argues that he provided consideration by obtaining investment funding for PST from Lewis Partners and the ELK Trust and, later, from his parents and the Bollners. Quick also argues that he did not commit a prior material breach, because there was no evidence that he breached the contract and no evidence that there was a contract for him to provide services to the PST Defendants. The PST Defendants counter that it was understood by the parties that part of the consideration for the Agreement was that Quick would continue to provide accounting services, so that his refusal to do so constituted failure of consideration.

According to Quick, Ruppman told him in 1995 that he did not have the money to pay him, but he suggested that Quick work for a percentage of PST's income as an arrangement going forward. Quick believed that he had an oral agreement with Ruppman to this effect. Under the oral agreement, Quick was to provide various services, including accounting services. Quick testified that, in February or March of 1995, he and Ruppman discussed a written agreement, which Quick drafted. However, no written agreement was executed until the Agreement was signed on January 23, 1997. Ruppman also testified that Quick was paid approximately $27,500. Quick's testimony indicated that $500 of that amount was for expense reimbursements and the remaining amount consisted of gratuitous payments. Quick testified that Ruppman informed him that the royalty deal was still in place, but that Ruppman stated that he wanted to get some money into Quick's hands to cover overhead. Ruppman testified that the payments were to assist Quick in some areas. Quick believed that the accounting and consulting services he was rendering to the PST Defendants would be included in the proposed royalty agreement.

Ruppman testified that, by the fall of 1997 through April, 1998, when Albers became involved, Quick's work for the PST Defendants was very minimal. In June of 1998, Ruppman and

Quick discussed repayment of the Bollners' and Quicks' promissory notes. From then until 2003, Quick and the PST Defendants or their representatives had discussions and negotiations concerning repayment of the promissory note and the PST Defendants' acquisition of the Agreement and the Bollners' royalty agreement. There was no evidence that Quick did any work for the PST Defendants after the June 1998 discussion with Ruppman. Ruppman testified that there was no contract for Quick to provide accounting services. However, he believed that Quick breached the Agreement by failing to assist with the activities of the company.

Failure of consideration occurs when, because of some supervening cause after an agreement is reached, the promised performance fails. *McGraw v. Brown Realty Co.*, 195 S.W.3d 271, 276 (Tex. App.--Dallas 2006, no pet.); *Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex. App.--Houston [1st Dist.] 2004, no pet.). Failure of consideration may result from one party's failure to perform its obligations under the agreement. *McGraw*, 195 S.W.3d at 276. Quick argues that, when a party challenges the adequacy of consideration, a court will not look beyond the face of the contract, unless it finds unconscionability, bad faith, or fraud. Quick argues that the trial court was precluded from looking beyond the consideration recited in the Agreement. Quick relies on various cases dealing with adequacy of consideration, including *Parker v. Dodge*, 98 S.W.3d 297, 301 (Tex. App.--Houston [1st Dist.] 2003, no pet.). However, as the court in *Parker* made clear, there is a distinction between failure of consideration and adequacy of consideration, and the presumption for which Quick argues applies when the issue of adequacy of consideration is raised. *Id.* at 301. This presumption does not apply to the issue of failure of consideration.

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). "In

determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994); *Tri-Star Petroleum Co. v. Tipperary Corp.*, 107 S.W.3d 607, 622 (Tex. App.--El Paso 2003, pet. denied). Quick argues that there was no evidence offered that he breached any agreement. We conclude that there was some evidence for the trial court to find that Quick promised to provide continued services to the PST Defendants in exchange for his royalty interest and that Quick breached that promise because he stopped doing any work for the PST Defendants. We overrule this issue.

### G. Fairfield's Attorney's Fees

Quick contends that the trial court erred in awarding attorney's fees to Fairfield pursuant to the Uniform Declaratory Judgments Act, TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001 *et seq*. Quick does not challenge the trial court's determination that the fees were reasonable and necessary or that they were equitable and just, but rather Fairfield's right to recover under the statute. The availability of attorney's fees under a particular statute is a question of law, which is reviewed *de novo*. *Time Out Grocery v. Vanguard Group, Inc.*, 187 S.W.3d 41, 42 (Tex. App.--Dallas 2005, no pet.).

Quick makes two arguments. First, he asserts that he did not bring a declaratory judgment claim against Fairfield. Quick claims that the language of his Third Amended Petition (the "Petition")[10] shows that Fairfield was not sued for a declaratory judgment. In the Petition, however, Quick broadly requests a declaratory judgment. The request is not limited to any particular defendant, nor did Quick limit to any defendant(s) his request for attorney's fees under section 37.004 of the Texas Civil Practice and Remedies Code. Quick also asserted a breach of contract

---

[10] This is the pleading upon which Quick went to trial.

claim against all Defendants.

Quick was specific with regard to other claims. For example, in his breach of fiduciary duty claim and claim for accounting, Quick specified that those claims were (only) against PST, PSMI, and Ruppman. Conversely, he asserted fraud, negligent misrepresentation, tortious interference, and conspiracy claims against "Defendants, including Fairfield." Quick sought to recover under an aider and abettor liability theory against Fairfield only.

With regard to the declaratory judgment action, however, the Petition's prayer requested that he "recover from Defendants, jointly and severally . . . [a] declaration from the Court that Plaintiff is entitled to his proportionate percentage of all income derived from the use of Present and Future Technology . . . ." Considering that the Petition is specific as to the parties sued for most of the claims, but open-ended with regard to the declaratory judgment claim, the language indicates that Fairfield was among the defendants sued for a declaratory judgment. *See Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 580 (Tex. App.--Houston [14th Dist.] 2004, no pet.) (discrimination claim was brought against both employer and supervisor, where the term "defendants" was used in alleging that claim, whereas a fraud claim was specific to supervisor).

Both Fairfield and the PST Defendants brought summary judgment motions against Quick. Quick points to his response to the PST Defendants' motion for summary judgment, in which Quick asserted that his declaratory judgment claim was proper, because "Defendants themselves have raised ambiguity of the contractual arrangements both as an affirmative defense and as a counterclaim." Quick contends that Fairfield did not raise ambiguity as an affirmative defense or counterclaim and that this shows that Fairfield was not sued for a declaration. However, the response relied upon by Quick was only addressed to the PST Defendants' motion for summary judgment, not that of Fairfield, and it defines the use of the term "Defendants" within the response

as referring to PST, PSMI, and Ruppman.[11] Accordingly, Quick's argument in this regard is without merit.

Quick's second argument is that Fairfield was not entitled to recover attorney's fees, because Fairfield's counterclaim for declaratory judgment merely sought to recover attorney's fees. We agree with Quick that, since Fairfield's counterclaim sought merely attorney's fees, it is not entitled to attorney's fees under its own counterclaim. *See Fowler v. Resolution Trust Corp.*, 855 S.W.2d 31, 37 (Tex. App.--El Paso 1993, no writ) (attorney's fees not available for a declaratory judgment claim that seeks the resolution of disputes already before the court). However, Fairfield's claim is based on Quick's having brought an unsuccessful declaratory judgment action against it. Under the Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. An award of attorney's fees is not limited to the plaintiff or the party seeking declaratory relief. *Hartford Cas. Ins. Co. v. Budget Rent-A-Car Sys., Inc.*, 796 S.W.2d 763, 771 (Tex. App.--Dallas 1990, writ denied). Moreover, because Quick had already invoked the Act, Fairfield was entitled to assert a claim for declaratory relief and attorney's fees. *First City Nat'l Bank v. Concord Oil Co.*, 808 S.W.2d 133, 138 (Tex. App.--El Paso 1991, no writ). Accordingly, Fairfield was entitled to recover its attorney's fees under the Act. We overrule this issue.

### III. CONCLUSION

We affirm the trial court's judgment that Quick and the PST Defendants take nothing on their respective claims for monetary relief, and that the Agreement is limited and applies only to income

---

[11] Quick's assertion that Fairfield did not assert ambiguity as an affirmative defense or counterclaim is somewhat questionable. In its Amended Answer and Counterclaim, Fairfield plead that it "asserts and incorporates herein by reference any and all affirmative defenses alleged by Plastic Solutions of Texas, Inc., Plastic Solutions Molding, Inc. and Kurt Ruppman, Sr. in their answers on file in this case."

derived from the licensing of the heat-set/barrier blow molding technology process that PST was trying to market in January of 1997, which used nitrogen at the blow-molding stage of bottle manufacturing, and that process alone. We affirm the trial court's judgment that Quick's claim for breach of contract was barred based on the defense of failure of consideration and prior material breach. We also affirm the trial court's judgment awarding attorney's fees and costs to Fairfield.[12]

KENNETH R. CARR, Justice

June 27, 2008

Before Chew, C.J., McClure, and Carr, JJ.

---

[12] The trial court determined that Fairfield was entitled to $77,000 in attorney's fees and $5,271 in trial court costs (plus post-judgment interest). While Quick has challenged Fairfield's right to recover any amount in attorney's fees, he has not challenged the reasonableness or necessity of the amount awarded. Payment of any amount of this award by the Bollners and/or the Quicks shall constitute a credit toward satisfying the award against Quick in this case.